UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SHARON K. PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:07-cv-0943-DFH-TAB |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Sharon Parker seeks judicial review of a decision by the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  After a hearing, an ALJ determined on behalf of the Commissioner that Ms. Parker's lower back and leg pain constituted a severe impairment but that she still retained the capacity to perform sedentary work.  The ALJ concluded that she was not entitled to benefits.  On judicial review, Ms. Wright is proceeding without an attorney.  She contends that the ALJ improperly relied on the assessment of the physician who testified at her hearing, who contradicted both the medical evidence and the opinions of her treating and examining physicians.

As explained below, the court reverses the ALJ's decision to deny benefits and will enter a final judgment directing the payment of disability insurance

benefits.   Ordinarily, the court would simply remand the case for further administrative proceedings.   But, despite an apparently thorough review of the evidence, the ALJ made serious errors in both fact and logic that cannot be sustained.  The record demonstrates that Ms. Parker probably met Listing 1.04A, which would call for at least a remand.  At the fifth step of the disability analysis, however, where the Commissioner has the burden of proof, the ALJ's finding that Ms. Parker retained the ability to do sedentary work is supported only by supposition and not by substantial evidence.  The record thus demonstrates that Ms. Parker has been disabled since her back injury on July 8, 2001, and was insured for benefits through March 31, 2006, R. 74.  Further proceedings are not only unnecessary but would unduly burden Ms. Parker.

*Background*

Ms. Parker was born in 1957 and has worked a variety of low-wage jobs throughout her life, including work as a cleaning crew member, grocery and convenience store clerk and stocker, and restaurant waitress and service trainer. She completed the eleventh grade.  She has been married and divorced three times and has two children and several grandchildren.  From at least some time in 2001, she has lived with her parents.

Before July 2001, she had experienced only some minor health problems such as a bone chip in her shoulder and a broken foot.  On July 8, 2001, however,

she was standing in a bus when she experienced suddenly severe pain in her lower back and throughout her left leg and foot.  R. 111, 145, 690-91.  A few weeks later, she was picking up one of her grandchildren when she again experienced severe pain in her lower back and left leg.

On August 9, 2001, Dr. William Mason read a magnetic resonance imaging (MRI) taken five days earlier and found "a very large" disc herniation behind and to the left side of Ms. Parker's fifth lumbar vertebra and sacrum that compromised the associated nerves.  R. 166-67.  He saw milder herniations, desiccation, and narrowing at Ms. Parker's third, fourth, and fifth lumbar vertebrae.  An x-ray taken the same day as the MRI indicated that rather than having the five vertebrae one would expect to find in the lumbar region, Ms. Parker had six lumbar vertebrae.  R. 175.

On August 16, 2001, Dr. Kenneth Haller confirmed Dr. Mason's findings, discussed possible treatment options with Ms. Parker, and noted that she wanted "to start with epidural steroid injections but says that basically she wants to do whatever it takes to get better, even if it is surgery."  R. 143.  According to Ms. Parker and her father, her pain was so intense "that often times she sits around with tears running down her face."  R. 145.  During a December 19, 2001, visit, Dr. Tung Nguyen, Ms. Parker's family doctor, noted that she had not yet pursued steroid injections or surgery because she could not afford them.  R. 209.

On November 21, 2001, Ms. Parker applied for supplemental security income and disability insurance.  R. 61-63, 377-78.  On December 31, 2001, Dr. A. Lopez reviewed Ms. Parker's medical records from Dr. Haller and Dr. Nguyen and completed a "Physical Residual Functional Capacity Assessment" form.  He reported that Ms. Parker was capable of performing sedentary work with the caveat that she should not climb ladders, ropes, or scaffolds.  R. 193-96.

On January 9, 2002, Ms. Parker went to a hospital emergency room complaining of severe left leg pain, numbness in her left foot, and incontinence. R. 240.  She reported that her pain prevented her from even lying flat.  An MRI revealed a disc herniation where Ms. Parker's fifth lumbar vertebra met her sacrum that was affecting the spinal canal and associated nerves.  R. 202.  Dr. Julius Silvidi performed emergency surgery to remove one large and several smaller disc fragments.   R. 237-38.   The surgery remedied that round of incontinence, left leg pain, and left foot numbness.  R. 285.

A few days after this surgery, however, Ms. Parker began experiencing pain in her right lower back, buttock, and leg that was more severe than the pain she had first experienced on her left side.  R. 286, 323, 692.  A February 12, 2002, MRI showed a small disc herniation at Ms. Parker's third and fourth vertebrae which mildly compressed the right side of the spinal cord sac.  R. 199-201.  A small disc herniation between Ms. Parker's fourth and fifth vertebrae slightly compressed the left side of the spinal cord sac.  On March 5, 2002, Dr. Neal

Coleman injected steroids into the disc herniation on the right side of Ms. Parker's third and fourth lumbar vertebrae.  She had about a week of relief before the pain returned.  R. 288.

On March 27, 2002, because of the disc herniation at Ms. Parker's third and fourth lumbar vertebrae, the smaller herniation at her fourth and fifth lumbar vertebrae, and her complaints of severe pain, Dr. Silvidi performed a second surgery.  He removed a large disc fragment and several smaller fragments from the space between Ms. Parker's third and fourth lumbar vertebrae.  He also removed several small disc fragments from the space between her fourth and fifth lumbar vertebrae.  R. 315-16.  After the surgery, Ms. Parker still experienced severe pain in her lower back and right upper leg.  Her right leg and foot turned out, causing her to limp, and she felt numbness in her left foot.  R. 289-90, 696.

In May 2002, Ms. Parker saw pain management specialist Dr. Scott Taylor. Dr. Taylor recommended physical therapy and more steroid injections and prescribed an anti-inflammatory.  R. 322-23.  On June 14, 2002, Dr. Coleman injected steroids into the space between Ms. Parker's fifth lumbar vertebra and her sacrum.  R. 260.  On June 21, 2002, Dr. Silvidi reported that he could not do anything more for Ms. Parker surgically.  R. 292.  Despite the surgeries and injections, Ms. Parker still complained of "terrific pain down the right" leg.  R. 326. An electrodiagnostic study on July 26, 2002, indicated that the nerves in Ms. Parker's right leg seemed to be functioning normally.  Despite this finding, Dr.

Taylor observed that her "symptoms certainly seem consistent with sciatica." *Id.*

A November 12, 2002, MRI showed disc dessication and mild stenosis and narrowing in the space between Ms. Parker's third and fourth lumbar vertebrae. R. 566. There were bulges in the spaces between her fourth and fifth lumbar vertebrae and her fifth vertebra and sacrum. Her spinal muscles showed "considerable asymmetry" and "apparent relative atrophy on the right." R. 567. On February 20, 2003, Dr. Coleman inserted a spinal cord stimulator into Ms. Parker's back that sent pulses to her brain in an attempt to scramble the pain messages. R. 608-09. The stimulator helped some and enabled her to "walk about one block with [a] very slow walk." R. 334, 694.

In an independent medical examination on April 19, 2003, Dr. Svetlana Bucchino observed that Ms. Parker had difficulty getting on and off the examination table. R. 333-34. She did not use a cane or a walker but relied on her then-husband for help. She had pain when Dr. Bucchino raised her right leg. R. 332. Based on her observations and her interview with Ms. Parker, Dr. Bucchino concluded that Ms. Parker's back surgeries had been ineffective, that the spinal cord stimulator provided partial relief, and that Ms. Parker was significantly impaired in her daily activities. *Id.* In a psychiatric consultation in April 2003 (Ms. Parker is not asserting a mental impairment here), Ms. Parker reported that in early 2003, she had abused over-the-counter sleeping pills "because my pain was so bad." R. 338.

On May 1, 2003, Dr. R. Fife affirmed an earlier physical residual functional capacity finding by Dr. J. Sands (who it appears reviewed Ms. Parker's medical records and completed the form in early June 2002) that Ms. Parker could perform sedentary work.  R. 340-48.  On May 8, 2003, Dr. Coleman examined Ms. Parker and found that she had limited range of motion in her lower back and pain when he lifted her right leg.  She could sit, stand, and walk for only one hour per day and would need to alternate sitting and standing or walking every half hour or so.  R. 367.  He estimated that her limitations had begun before March 5, 2002.

From 2003 to 2006, Ms. Parker regularly received steroid injections.  She continued to experience incontinence, complained of a burning sensation in her feet, and had pain in her right leg and lower back.  On June 23, 2004, Dr. Coleman noted that Ms. Parker could not afford the pain medication he had prescribed in previous visits.  R. 649.  An October 19, 2004, a CT scan revealed a disc protrusion in the space between Ms. Parker's second and third lumbar vertebrae and a disc herniation in the space between her fifth lumbar vertebra and sacrum, both of which Dr. Richard Huss thought might have been affecting the surrounding nerve roots.  R. 656-57.

Ms. Parker was initially scheduled for an administrative hearing on April 8, 2005.  The medical expert called to testify, Dr. Mark Stevens, informed the ALJ that at the time the January 9, 2002, MRI was taken, Ms. Parker met Listing 1.04A.  R. 718.  Dr. Stevens felt, however, that he needed to see results from

another physical exam to say whether Ms. Parker continued to meet the listing after her surgeries.  R. 721.  The ALJ and Ms. Parker's attorney agreed to send her for an orthopedic consultative exam.  R. 719.

A CT scan the week after this hearing confirmed that Ms. Parker had six (rather than five) lumbar vertebrae.  R. 606.  The scan revealed disc bulging in the space between Ms. Parker's eleventh and twelfth thoracic vertebrae.  A disc bulge in the space between Ms. Parker's third and fourth lumbar vertebrae caused moderate stenosis on the left side.  A disc bulge in the space between Ms. Parker's fourth and fifth lumbar vertebrae caused moderate stenosis on the right side.  A disc bulge in the space between Ms. Parker's fifth and sixth lumbar vertebrae caused mild stenosis on the left side.  R. 607.

On May 19, 2005, Dr. Sandeep Kalra conducted the independent medical exam the ALJ ordered at the first hearing.  Dr. Kalra reported that Ms. Parker was currently using a cane to help her get around and was "unsustainable without the cane."  R. 373.  She had reduced range of motion in her lower back and could not raise her leg above a thirty degree angle without back pain.   Relying on Ms. Parker's assessments of her capabilities, Dr. Kalra concluded that Ms. Parker could sit, stand, and walk no more than one hour a day and could never squat, crawl, or climb.  R. 375-76.  A registered nurse noted on June 9, 2005, that Ms. Parker needed to use a cane to stand and walk because her right leg turned out and could not support her.  R. 605.

Ms. Parker had a second administrative hearing on October 27, 2005.  She reported being able to sleep for only two hours at a time:

> A:    Two hours sleep at one time is the most I ever get.
> Q:    And why is that?
> A:    I have charley horses severely bad in both of my calves.  If I'm layin' the wrong way I have this shooting pain.  If I try to lay on the right side, I get the numbness in the hip.

R. 697-98.  She also reported that she was able to walk up three stair steps before having to stop because the pain reduced her to tears.  R. 696-97.  She could sit for about fifteen to twenty minutes before needing to get up and walk around.  R. 695.  She used a cane at the hearing and had to stand up several times during the proceeding.

Dr. Arthur Lorber testified and discussed Ms. Parker's three MRIs, noting that the third MRI revealed mild protrusions at the discs between the third, fourth, and fifth lumbar vertebrae.  R. 703.  He stated, "I don't know what mild means except it doesn't mean severe. . . . and it generally doesn't mean moderate, but it's a subjective term.  It would indicate there was no great concern about those disc protrusions."  R. 704.  He also testified that the disc bulges and herniations seen on the CT scans were "open to question" because the CT scans do not "differentiate well between scar tissue and recurrent disc herniations."  *Id.* When pressed by Ms. Parker's attorney, Dr. Lorber identified several clinical signs that would indicate a compromised nerve:  (1) pain during a straight leg raise test; (2) abnormal reflexes in the affected area; (3) abnormal sensation in the affected

area; and (4) weakness in the affected area.  R. 708-09.  He also reported that physicians implanted spinal stimulators to treat "[i]ntractable, severe pain."  R. 710.

The vocational expert, Stephanie Archer, testified that a person using a cane to ambulate and with a need to alternate between standing and sitting could still perform sedentary work.  Employees generally needed to be able to sit for twenty to thirty minutes at a time, but could continue doing sedentary work while standing as well.  R. 713-14.  If the person who needed to stand often also had to use a cane to stand, that person would not be able to perform sedentary work.  R. 715.

On April 11, 2006, the ALJ denied Ms. Parker's applications for supplemental security income and disability insurance benefits.  R. 30.  He found that while her lower back and leg pain created a severe impairment, she could perform sedentary work without restrictions, including assembling, packing, and tending machines.  R. 29.  The Appeals Council denied Ms. Parker's request for review, leaving the ALJ's decision as the final decision of the Commissioner of Social Security.  See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).  Ms. Parker asks this court to review the denial.  This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).  Additional facts are noted below as needed.

*Statutory Framework for Determining Disability*

To be eligible for disability insurance benefits or supplemental security income, Ms. Parker must establish that she suffers from a disability as defined by the Social Security Act ("Act") in 42 U.S.C. §§ 423(d), 1382c(a)(3).  Under the Act, a disability is an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of no less than twelve months.

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  See *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  The Act provides important assistance for some of the most disadvantaged members of American society.  But before tax dollars are available for disability benefits, it must be clear that the claimant has an impairment severe enough to prevent her from performing virtually any kind of work.

The implementing regulations for the Act provide the familiar five-step sequential evaluation of a disability claim.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The steps are:

(1)    Is the claimant currently employed?  If so, she is not disabled.

(2)    If not, does the claimant have a severe impairment or combination of impairments?  If not, she is not disabled.

(3)     If so, does the impairment meet or equal an impairment listed in Appendix 1 to Subpart P of Part 404 of 20 C.F.R.?  If so, the claimant is disabled.

(4)     If not, does the claimant retain the residual functional capacity to perform her past relevant work?  If so, she is not disabled.

(5)     If not, according to the claimant's residual functional capacity, age, education, and work experience, can the claimant make an adjustment to other work?  If so, she is not disabled.  If not, she is disabled.

When applying this test, the burden of proof rests on the claimant for the first four steps and on the Commissioner for the fifth step.  See *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

*Standard of Review*

This court does not consider the evidence as if the court were the original hearing officer.  On judicial review, if the Commissioner's decision is supported by substantial evidence, the court must uphold that decision even if the court might have decided the case differently in the first instance.  See 42 U.S.C. §§ 405(g), 1383(c)(3).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses.  See *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or if the ALJ based the decision on serious factual mistakes or omissions, *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  The ALJ has a basic obligation to develop a full and fair record, *Nelson*, 131 F.3d at 1235, and must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful

judicial review of the administrative findings, *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003).  If the evidence on which the ALJ relied does not support the conclusion, the decision cannot be upheld.  *Id.*

Ordinarily a credibility finding by an ALJ is binding on a reviewing court, unless that finding is based on errors of fact or logic.  See *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).  In making a credibility determination, the ALJ must give specific reasons for the weight given to the claimant's statements so that the claimant and subsequent reviewers will have a fair sense of how the claimant's testimony was assessed.  See *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003); *Steele v. Barnhart*, 290 F.3d 936, 941-42 (7th Cir. 2002); Social Security Ruling 96-7p, 61 Fed. Reg. 34,483, 34,486 (July 2, 1996).  A remand is required when the ALJ makes credibility findings based on "serious errors in reasoning rather than merely the demeanor of the witness."  *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004).

### The ALJ's Disability Determination

Applying the five-step process, the ALJ found at the first step that Ms. Parker had not been employed since her alleged onset date of July 8, 2001.  At the second step, the ALJ determined that Ms. Parker's lower back and leg pain created a severe impairment.  At the third step, based on Dr. Lorber's testimony, the ALJ found that this impairment did not meet or equal Listings 1.04A, B, or C.  At the

fourth step, the ALJ determined that Ms. Parker could not perform any of her past relevant work.  At the fifth step, the ALJ found that Ms. Parker could perform sedentary work.

## Discussion

The ALJ's opinion is well written and persuasive upon the first reading, but it contains errors in both fact and logic so serious that they warrant a reversal rather than a remand.  The substantial evidence shows that Ms. Parker probably met Listing 1.04A, but regardless, that she does not have the residual functional capacity to perform sedentary work.

## I.     Listing 1.04A

Listing 1.04A, as applied to lower back injuries, instructs courts to find a person disabled who:  (1) has spinal nerve root compression that causes pain in the affected areas; (2) has limited range of motion in the lower back; (3) has lost motor functioning as well as lost sensory or reflex functioning; and (4) experiences pain during straight-leg raising tests.  20 C.F.R., Pt. 404, Subpt. P, App. 1 § 1.04.

Each of Ms. Parker's MRIs and CT scans shows stenosis and disc bulging or herniation.  While only the January 9, 2002 MRI showed severe nerve root compression, that finding prompted Dr. Silvidi to send Ms. Parker into emergency surgery that same day.  The later images showed only mild to moderate defects.

Both Dr. Lorber, the physician who testified at Ms. Parker's second hearing, and the ALJ focused on this difference between the January 9, 2002 MRI and the later MRIs and CT scans.   Dr. Lorber testified that evidence of mild or moderate stenosis, disc protrusions, and disc herniations meant that "there was no great concern about those disc protrusions."  R. 704.

The later MRI and CT scan evidence may not have been the sole cause of great concern, but the evidence as a whole undeniably shows that Ms. Parker's treating and examining physicians recognized and tried to address very severe pain.  Dr. Coleman and Dr. Millicent Moye, a pain specialist who had treated Ms. Parker since September 2002, opined that she was disabled.  R. 409, 669.  Dr. Taylor observed that despite the imaging results, clinically her "symptoms certainly seem consistent with sciatica."  R. 326.  She had positive straight-leg raising tests (meaning she experienced pain as the doctor lifted her leg straight up).  R. 332, 369, 373.  She walked with a visible limp and had trouble squatting. R. 204, 332.  Dr. Silvidi performed a second surgery in an attempt to remedy the severe pain that shifted from her left to her right side just a few days after the first surgery.  Dr. Coleman implanted permanently a spinal cord stimulator, a device that Dr. Lorber testified is used on patients who suffer from "[i]ntractable, severe pain."  R. 710.  Ms. Parker's uncontradicted testimony and self-reports of pain to her treating and examining physicians also demonstrate that she consistently experienced severe lower back pain, right leg pain, and numbness in her hips and both legs after her second surgery.

In finding that Ms. Parker's impairment did not meet Listing 1.04, Dr. Lorber discounted the treating physicians' observations of Ms. Parker's limitations and her own descriptions of her pain because only one of her MRIs had shown a severe nerve root compression.  That compression had caused Ms. Parker to experience significant and sudden incontinence, R. 240, and prompted immediate surgery.  The Social Security Act does not require that the medical evidence show consistently that the claimant's impairment is so severe that she needs immediate surgical attention.  Dr. Lorber also discounted the treating physicians' evaluations and Ms. Parker's testimony because he thought Ms. Parker's CT scans were "open to question" because CT scans can confuse disc herniations with scar tissue.  R. 704.

That may be true, but the clinical evidence taken as a whole demonstrated that Ms. Parker's spinal impairment met Listing 1.04A.  She had an obvious limp, numbness, limited range of motion, severe pain in her lower back and right leg, positive straight-leg raises, *and* evidence of stenosis.  The ALJ's failure to address this evidence adequately is sufficient to warrant a remand.  See generally *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (remanding denial of benefits for more thorough review of evidence supporting finding that claimant met Listing 1.04A where claimant "complained of lower back pain that radiated to his right leg, had a limited range of motion in his spine, and experienced pain during straight-leg raising tests").

II.    *Residual Functional Capacity Determination*

Turning to the fifth step of the analysis, however, the ALJ's finding that Ms. Parker could perform sedentary work is based on serious factual errors and omissions that warrant reversal rather than remand.  One of the most troubling portions of the ALJ's decision is his description of remarkable improvement in Ms. Parker's strength, ambulatory ability, and pain relief.  The ALJ wrote that Ms. Parker showed:

> good strength with no sensory deficits or atrophy in the lower right extremity (Ex. 1F/68).  Although her strength was slightly decreased to 4/5 on April 19, 2003, in May of 2005 it was 5/5 and sensation was intact (Ex. 2F at 2).  In between these two examinations, the claimant's stimulator was adjusted and she received facet injections which completely relieved her pain (Ex. I at 29).  Her range of motion increased from lumbar flexion of 40 on November 24, 2003, to 45 on January 23, 2004 to 75 in May of 2005 (Exs. I at 12, 16 and 2F at 3).  She reported decreased pain in her right leg and she was walking daily.  (Ex. I/34).

R. 26.  When one views the record as a whole, however, as this court must, these selected items drawn from various medical records do not accurately represent the prognoses that Ms. Parker's treating and examining physicians gave of her condition.

In the first medical record the ALJ cited, Dr. Taylor's report on May 13, 2002, the ALJ ignored the observations that Ms. Parker was walking with a limp, had a positive sciatic stretch in her right leg, and was "markedly tender" in her right spine.  R. 204.  In the second record, Dr. Kalra's observation on May 19,

2005, the ALJ ignored the observations that Ms. Parker could not walk on her heels and toes due to back pain, could not squat fully due to back pain, and was unable to raise her leg above a thirty degree angle because of back pain. R. 373. The record indicating that Ms. Parker's range of motion had increased in her lumbar area by May 19, 2005, actually shows that Ms. Parker was able to flex forward seventy-five degrees, with the normal range being ninety degrees. R. 374. She could extend fifteen degrees, with twenty-five degrees being the norm. She could flex laterally in both directions fifteen degrees, with twenty-five degrees being the norm.

The ALJ cited one record to find that steroid injections "completely" relieved her pain. He ignored several reports and Ms. Parker's testimony that the injections helped only temporarily. R. 288, 413, 418, 431, 436, 443, 695. It is commonly understood that steroid injections provide only short-term relief. See MayoClinic.com, *Epidural Steroid Injections for Back Pain: Why Limited Dosing?*, http://www.mayoclinic.com/health/epidural-steroid-injections/AN01892 (last visited Sept. 8, 2008) (observing that steroid injections "can help relieve pain, although only temporarily"). Similarly, one note in July 2004 that Ms. Parker reported "walking daily" does not indicate that she was walking at any length or with any ease, particularly when compared with the evidence that Ms. Parker walked with an obvious limp and needed a cane to support herself. Taken as a whole, the records the ALJ cited do not provide substantial support for the idea that Ms. Parker had good strength, range of motion, and ambulatory skills.

The ALJ also described Ms. Parker's treatments as "rather routine."  He stated that she must have gotten relief from her treatments because she did not seek out physical therapy.  R. 26.  Multiple surgeries, years of steroid injections, and the permanent implantation of a device used to try to alleviate "intractable" pain by scrambling the brain's natural messages cannot reasonably be described as routine.  The evidence also shows that Ms. Parker did strengthening exercises, R. 660, that she went to at least some physical therapy, R. 693, and that she sometimes had to defer treatments because she could not afford them, R. 128, 209, 649.  An ALJ cannot use a failure to seek a particular treatment that a claimant could not afford to support a denial of benefits.  See *Herron v. Shalala*, 19 F.3d 329, 336 (7th Cir. 1994) (questioning ALJ's decision to discredit claimant because claimant did not submit any new medical records at second hearing); *Caviness v. Apfel*, 4 F. Supp. 2d 813, 820-21 (S.D. Ind. 1998) (remanding where ALJ discredited claimant for failing to seek additional treatment that she could not afford).  One would not logically expect Ms. Parker to spend her limited funds on physical therapy when she could attempt to do simple strengthening exercises on her own.

The ALJ based his residual functional capacity determination on Dr. Lorber's testimony that Ms. Parker could perform sedentary work.  R. 25, 706. Dr. Lorber's testimony at the hearing contradicted, however, the opinions of Ms. Parker's panoply of treating and examining physicians.  The opinions of the claimant's treating physicians are entitled to controlling weight unless they are

contradicted by substantial, well-supported evidence.   See 20 C.F.R. § 404.1527(d)(2) (instructing courts to give controlling weight to treating physician's opinion if "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [ ] not inconsistent with the other substantial evidence"); see generally *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (remanding denial of benefits where a consulting physician's opinion "merely expressed a contrary view" to that of two treating physicians whose opinions were entitled to great weight).

The ALJ went to great pains to distinguish Dr. Lorber's credentials from those of Ms. Parker's treating and examining physicians.   But such efforts are unnecessary where the consulting physician's contradictory opinion is not supported by substantial evidence.   See *Bauer*, 532 F.3d at 608; 20 C.F.R. § 404.1527(d)(2).   As discussed above, the substantial evidence demonstrated that Ms. Parker had a severe spinal impairment that strictly limited her ability to function at all, let alone work.   Dr. Lorber rested his opinion on the fact that only the January 2002 MRI showed severe nerve root compression.   R. 702-05.   That may have been true, but the clinical evidence also showed that she had an obvious limp, numbness, limited range of motion, severe pain in her lower back and right leg, positive straight-leg raises, and evidence of stenosis.   Dr. Lorber testified that those symptoms would indicate a compromised nerve root.   R. 708-09.   Clearly, something was seriously wrong with Ms. Parker's spinal column.

The decisive problem here is that the vocational expert testified that someone who needs to stand frequently but also must use a cane to do so could not perform even sedentary work.  R. 715.  The ALJ found that Ms. Parker could work as an assembler, packer, and/or machine tender, R. 29, but the vocational expert had testified that a person could not do those jobs if she needed to use a cane.  R. 713.  Addressing this testimony, the ALJ found that Ms. Parker did not need a cane.  In support of this finding, the ALJ offered only the fact that Dr. Lorber did not say that she needed one.  R. 29-30.  That conclusion is simply unsupported.  Dr. Lorber did not testify about Ms. Parker's need for or lack of a need for a cane at all.  The ALJ saw Ms. Parker using a cane at the second hearing and remarked that "she was walking rather gingerly."  R. 690.  He read Dr. Kalra's report that in May 2005, Ms. Parker was "unsustainable without the cane."  R. 372-73.  He read a nurse's report in June 2005 that Ms. Parker needed a cane because the pain in her right leg caused her leg to give out.  R. 605.  Silence from Dr. Lorber, who was not asked about this subject, is not substantial evidence to uphold the critical finding that Ms. Parker was able to support herself without a cane.

Without that finding, the vocational expert's testimony requires a finding that Ms. Parker is not able to do even the sedentary work the ALJ found she could do, so that she has been disabled and is entitled to benefits.  It was error to conclude otherwise.  The record has been fully developed.  Ms. Parker has been disabled since her back injury on July 8, 2001 and has had two administrative

hearings.  There is no need to send the case back for yet another proceeding.  See, *e.g.*, *Micus v. Bowen*, 979 F.2d 602, 607-09 (7th Cir. 1992) (ordering payment of benefits where the ALJ erroneously rejected a treating physician's opinion, which substantial evidence supported, for the "speculative statement" of a consulting physician); *Woody v. Secretary of Health & Human Services*, 859 F.2d 1156, 1161-63 (3d Cir. 1988) (ordering payment of benefits after eight years of proceedings where ALJ's denial of benefits was inconsistent with reports from the claimant's treating physicians and otherwise not supported by substantial evidence); see generally *Wilder v. Apfel*, 153 F.3d 799, 804 (7th Cir. 1998) (ordering payment of benefits on second appeal).

*Conclusion*

For the foregoing reasons, the court reverses the ALJ's decision to deny benefits and will enter a final judgment directing the payment of disability insurance benefits.

So ordered.

Date: September 17, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

SHARON K. PARKER
615 E 22nd Street
Muncie, IN 47302